## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SEAN E. M. HOTUNG,

                Plaintiff,

     v.

A CARGO OF A CRATE CONTAINING
NINE BOXES OF DOCUMENTS SHIPPED
ABOARD THE M/V HANJIN NAGOYA
UNDER BILL OF LADING NO.
HK206003003 DATED MAY 14, 2006, *in
rem*; PARAMOUNT TRANSPORTATION
SYSTEMS, INC.; and SANTA FE
TRANSPORT INTERNATIONAL LTD.,

           Defendants.

Civil Action No. 06-2904 (KSH)

**OPINION**

---

**KATHARINE S. HAYDEN, U.S.D.J.**

## I.  INTRODUCTION

On June 27, 2006, plaintiff Sean E. M. Hotung ("plaintiff") commenced an *in rem* action

against the defendant "cargo of a crate containing nine boxes of documents shipped aboard the

M/V Hanjin Nagoya under bill of lading no. HK206003003 dated May 14, 2006" (hereafter,

"cargo") by filing a verified complaint[1] in this Court, invoking this Court's admiralty and

---

[1]The document is entitled "Verified Complaint."  Its precatory statement reads: "Plaintiff, Sean E. M. Hotung, by his attorneys, Healy and Baillie, LLP, for his Verified Complaint alleges, upon information and belief, as follows: . . . ."  The lead attorney for plaintiff, Jack A. Greenbaum, Esq. of Healy and Baillie filed an accompanying document entitled Verification, stating that the reason "deponent" (Greenbaum) was making the verification is that plaintiff was not within the Court's jurisdiction, and that the sources of the deponent's information and grounds for his belief were statements of and documents produced by plaintiff and investigations

maritime jurisdiction under 28 U.S.C. § 1333.  The complaint avers that plaintiff had arranged a shipment of business documents from Hong Kong to his home in Saugerties, NY through defendant Santa Fe Transport International, Ltd. ("Santa Fe").  Plaintiff alleged that his father, Eric E. Hotung, without authority to do so, directed Santa Fe not to deliver the cargo to plaintiff and to return the goods immediately to Hong Kong.  Plaintiff alleged that Santa Fe breached its contract with plaintiff by complying with the father's directions.

Plaintiff initiated this action by *ex parte* application, pursuant to which  the Court issued a warrant for the arrest of the cargo and appointed a third-party custodian to keep and protect the goods pending further orders.  The Court also issued an order to show cause why the cargo should not be released immediately to the plaintiff,  pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule D of the Supplemental Rules for Certain Admiralty and Maritime Claims. Within the time frame provided by the emergent relief, Hotung Enterprises Limited ("HEL") and Hotung Investment (China) Limited ("HICL") intervened, claiming to be the true owners of the cargo, entitled to immediate possession of it.

Plaintiff filed an amended verified complaint[2] on July 28, 2006, asserting diversity jurisdiction in addition and in the alternative to admiralty and maritime jurisdiction.  On July 31, 2006, counsel for HEL and HICL (collectively, "intervenors"),  and plaintiff and his counsel

---

undertaken at deponent's direction.

[2]This amended complaint had a similar lead-in sentence, and was signed by Matthew James, Esq. of the Healy & Baillie firm.  James filed an accompanying document entitled Verification, stating that the reason "deponent" (James) was making the verification is that plaintiff was not within the Court's jurisdiction, and that sources of the deponent's information and grounds for his belief were statements of and documents produced by plaintiff and investigations conducted by plaintiff and deponent.

appeared before the Court.   The Court heard argument and the plaintiff testified concerning the matters raised in his lawsuit.   After the hearing the Court directed counsel to file further briefs focused on the intervenors' assertion that the Court does not have subject matter jurisdiction.

The restraints granted at the time of plaintiff's emergent application continue in effect, whereby the cargo remains in the custody of a third party, so that neither the plaintiff nor his father has possession of the papers.

## II.    JURISDICTION AND STANDING

In the first verified complaint upon which this Court ordered the arrest of the cargo and the order to show cause, plaintiff asserted "[t]his is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure."   The intervenors argue that the underlying dispute is not maritime and that "this Court's admiralty jurisdiction does not extend to Rule D <u>replevin</u> type actions, absent the breach of a maritime contract or commission of a maritime tort."   (Intervenors' Moving Brief at 4.)   They contend that "[s]ince there is no breach of a maritime contract and no maritime tort has been committed, there is no maritime jurisdiction and the arrest of the defendant cargo cannot stand." (<u>Id.</u>)

In opposition, plaintiff argues that he has a maritime contract with Santa Fe, the freight forwarder,  because he is shown as the shipper on Santa Fe's house waybill.  (Plaintiff's Opposition Brief at 14.)  Plaintiff argues that Santa Fe was listed as the shipper on the bill of lading issued by Profit Cheer Line ("Profit Cheer") "<u>only</u> by virtue of being plaintiff's agent." (<u>Id.</u> at 1.)  Therefore, plaintiff concludes, admiralty jurisdiction exists because "each aspect of the shipment is inseparable from and dependent upon the maritime ocean transport of the Cargo."

(Id.)

Intervenors argue that the plaintiff was not a party to the Santa Fe house waybill (Moving Brief at 7), nor was the plaintiff a party to the Profit Cheer bill of lading (Id. at 5). Accordingly, they argue, "[p]laintiff has no standing to allege breach of contract, maritime or not." (Id.) Intervenors claim that because they are the "owners of the cargo and [they are] the entities that hired the carrier to arrange the transport with straight, non-negotiable bills of lading," the cargo should be immediately returned to them. (Id.)

Putting aside the assertion of diversity jurisdiction in the amended complaint, the Court must decide whether this matter was properly brought before it pursuant to its admiralty and maritime jurisdiction as a necessary predicate to ruling on the continuation of the restraints initially granted under the original complaint, and in order to resolve the parties' divergent claims as to which is the governing contract and who are the parties to that contract.

### A.    Admiralty and Maritime Jurisdiction

According to 28 U.S.C. § 1333,  "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  Whether or not a contract falls within that "admiralty or maritime jurisdiction" depends upon "the nature and subject-matter of the contract."  New England Mut. Marine Ins. Co. v. Dunham,  78 U.S. 1, 26 (1870).  "[C]ontracts purely for transporting goods on water are wholly maritime and thus within the federal courts' admiralty jurisdiction."  Berkshire Fashions, Inc. v. M.V. Hakusan II,  954 F.2d 874, 880 (3d Cir. 1992).   In this case, the cargo was shipped by ocean freight from Hong Kong pursuant to an ocean bill of lading issued by Profit Cheer.  Neither party disputes that the

4

Profit Cheer bill of lading is a maritime contract.  However, there is also a contract with the freight forwarder, defendant Santa Fe, which plaintiff alleges was breached when Santa Fe "fail[ed] and refus[ed] to deliver the Cargo to Plaintiff."  (Amended Verified Complaint ¶ 40.) The parties differ on whether that contract falls within the Court's admiralty jurisdiction.  In addition, intervenors argue that the cargo was arrested after the governing maritime contract was fully performed, calling into question the plaintiff's assertion of maritime jurisdiction in his original application to this Court.

Intervenors argue that the maritime contract was fully performed when the cargo was delivered to the "place of delivery" noted on the Profit Cheer bill of lading.  (Moving Brief at 5-6.)  The "place of delivery" listed on that bill of lading is "New York, NY."  (Id.)  They submit that because the Profit Cheer bill of lading is a "port to port bill of lading," not a "through bill of lading," the carrier's obligation ends when the cargo is delivered to the port of discharge.  (Id. at 5.)  Once the carrier's obligation ends, they contend, "the maritime venture comes to an end," defeating any claim to maritime jurisdiction beyond that point.  (Id. at 5-6.)

Plaintiff argues that the Court should consider the entire shipping process to determine the parameters of maritime jurisdiction, and suggests that because the house waybill issued by Santa Fe is for a "door to door" shipment (Plaintiff's Opposition Brief at 16), maritime jurisdiction continues to apply until the cargo is delivered to the door of the consignee, well beyond the port of discharge listed on the bill of lading.  (Id. at 14-17.)  Intervenors argue in opposition that because Santa Fe is a freight forwarder that merely arranged for the shipment of

the cargo with Profit Cheer, the Santa Fe waybill does not give rise to maritime jurisdiction[3].
(Moving Brief at 9.)  They invoke the preliminary contract doctrine,  stating that "[a] long
recognized principle under general maritime law is that preliminary agreements with respect to
maritime contracts are not cognizable in admiralty."  (Id. at 10, citing Shipping Financial
Services Corp. v. Drakos, 140 F.3d 129, 133-134 (2d Cir. 1998).)  In addition, they state that
there is no maritime jurisdiction "when a freight forwarder's alleged breach occurs after the
ocean voyage has been completed."  (Moving Brief at 10, citing Johnson Products Co., Inc. v.
M/V La Molinera, 628 F.Supp. 1240, 1241 (S.D.N.Y. 1996).)

The preliminary contract doctrine "excludes 'preliminary services' from admiralty."
Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 607 n.3 (1991).  Intervenors do not
explain why they believe Santa Fe's services fall under the category of "preliminary services."  In
Ingersoll Mill. Mach. Co. v. M/V Bodena,  829 F.2d 293 (2d Cir. 1987), *cert. denied*, 484 U.S.
1042 (1988), the Second Circuit considered whether the services provided by the plaintiff freight
forwarder were preliminary in nature such that they were subject to the preliminary contract
doctrine.  That court stated, "[t]he preparation and processing of export declarations, delivery
orders, dock receipts, bills of lading, and advance notification of shipment are not services
rendered preliminary to a voyage rather they are essential to it. Without these, there can be no
voyage." Id. at 302.  In the case at bar, plaintiff claims that Santa Fe prepared the shipping
documents, delivered the cargo to the port in Hong Kong, subcontracted with Profit Cheer for
ocean carriage, and subcontracted with a transportation company in California for custom

---

[3]Intervenors make this argument without abandoning their argument that plaintiff had no
contractual relationship with either Santa Fe or Profit Cheer that might give rise to a breach of
contract claim.

clearance, inland transportation and notification of shipment.  (Plaintiff's Opposition Brief at 17.)
Intervenors have not disputed plaintiff's characterization of the services provided by Santa Fe.
Therefore, for the purposes of deciding the jurisdictional question only, the Court finds that the
services provided by Santa Fe were not preliminary in nature such that they are automatically
excluded from this Court's maritime jurisdiction based on the preliminary contract doctrine.

 The Court does not find the intervenors' next argument any more persuasive.  As stated
above, intervenors argue that there is no maritime jurisdiction over an alleged breach that occurs
"after the ocean voyage has been completed."  (Moving Brief at 10, citing <u>Johnson Products Co.,
Inc. v. M/V La Molinera</u>, 628 F.Supp. 1240, 1241 (S.D.N.Y. 1996).)  However in the case cited,
the court merely stated, without additional explanation, that "the plaintiffs' claims against freight
forwarder ICS, which allege fraud and negligence in acts performed on land, are not within the
Court's admiralty jurisdiction."  <u>Johnson Products Co., Inc. v. M/V La Molinera</u>, 628 F.Supp. at
1241.  Exercising diversity jurisdiction over that claim, the court found that the freight forwarder
breached its fiduciary duty to the plaintiff, part of which breach occurred while the goods were
still on the high seas.  Therefore, contrary to the intervenors' contention,  it is clear that the
court's decision to decline admiralty jurisdiction did not turn upon whether or not the ocean
voyage was complete.

 "The boundaries of admiralty jurisdiction over contracts . . . have always been difficult to
draw." <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 735 (1961).  The courts have long favored an
individual facts-and-circumstances approach, where "the true criterion is the nature and subject-
matter of the contract." <u>New England Mut. Marine Ins. Co. v. Dunham</u>,  78 U.S. 1, 26 (1870).
<u>Also</u> <u>see</u> <u>Exxon Corp. v. Central Gulf Lines, Inc.</u>, 500 U.S. 603, 611 (1991) ("[T]he trend in

modern admiralty case law . . .  is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime.").

Under the circumstances of this case, the Court agrees with the Second Circuit's analysis in Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, and finds that the contract entered into with the freight forwarder was essential to the ocean voyage itself, and therefore the nature of that contract is maritime.  As such, the Santa Fe contract falls within the admiralty jurisdiction of this Court.

Intervenors argue that any obligations under the maritime contract ended when the cargo was delivered to the "place of delivery" indicated on the Profit Cheer bill of lading because that bill of lading is a "port to port bill of lading," not a "through bill of lading." (Moving Brief at 5-6.)  They state, "[s]ince the ocean carrier's obligations are completed when the cargo is delivered at the place designated in the 'place of delivery' box in the bill of lading, there can be no doubt that Profit Cheer had no obligation to deliver the cargo to Plaintiff at his residence in Saugerties, New York or at any other intended point." (Id. at 6.)  Curiously absent from intervenors' argument, however, is a statement that the cargo ever made it to the "place of delivery" listed on that bill of lading – New York, N.Y.  Intervenors state that "the cargo was seized after it was delivered to the notify party [in San Marcos, California], made its way to Poughkeepsie, New York and then to Bayonne, New Jersey." (Id. at 3.)  Therefore, regardless of whether the end point of the maritime portion of this shipment was, as intervenors contend, New York, N.Y., or as plaintiff contends, Saugerties, N.Y., the record does not show that the cargo had reached either point when this Court ordered its arrest.  Therefore, the Court finds that the cargo was still subject to a maritime contract at the time of its arrest, and the intervenors' motion to dismiss for

8

lack of subject matter jurisdiction is denied.[4]

## III.   ORDER TO SHOW CAUSE

On July 31, 2006, the Court held a post-arrest show cause hearing at which plaintiff testified and his attorney and counsel for the intervenors presented argument.  According to Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, "[w]henever  property is arrested . . . any person claiming an interest" in the property may challenge the arrest at a hearing "at which the plaintiff shall be required to show why the arrest or attachment should not be vacated."  Fed. R. Civ. P. Supp. Adm. & Mar. Cl. E(4)(f).  The purpose of the post-arrest hearing is not to decide the ultimate issue between the parties, "but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant."  Salazar v. Atlantic Sun,  881 F.2d 73, 79-80 (3d Cir. 1989).  At the July 31st hearing, the Court clarified that the purpose of the show cause hearing was not to decide whether the cargo would be turned over to the plaintiff, but only to decide whether to extend the temporary relief granted by the arrest of the cargo.  (Transcript of Order to Show Cause Hearing at 18:19-22 (July 31, 2006).)

The cargo was arrested pursuant to Rule D of the Supplemental Rules for Certain Admiralty and Maritime Claims.  Rule D "applies to an *in rem* action to acquire title to maritime property."  Thypin Steel Co. v. Asoma Corp.,  215 F.3d 273, 282 (2d Cir. 2000).  Therefore, the party urging arrest of maritime cargo under rule D must have legal title or a legal claim to

---

[4]In plaintiff 's amended verified complaint, he requested a writ of replevin as an alternative grounds for relief if the Court declined to exercise admiralty jurisdiction.  In his opposition to the motion to dismiss, plaintiff stated, "[s]hould admiralty jurisdiction be upheld, Plaintiff's request for a Writ of Replevin would be moot."  (Opposition Brief at 2-3.)  Because the Court has upheld admiralty jurisdiction, the Court accepts that the plaintiff has voluntarily withdrawn his replevin claim (count II in the amended verified complaint.)

possession in order for the Rule D arrest to stand. See, e.g., Stathos v. The Maro, 134 F.Supp. 330, 332 (E.D.Va.1955).

During the hearing, plaintiff testified.  As noted earlier, the original documents filed on his behalf had been verified by his attorney Jack Greenbaum, and the amended "verified complaint" filed on July 28, 2006 was verified by his attorney Matthew James.  The attorneys stated that the complaints were not verified by plaintiff because he was outside the Court's jurisdiction.

Even before plaintiff took the witness stand, Matthew James, appearing for plaintiff at the hearing, told the Court that the lawsuit arose out of deep-seated family dissentions.

> THE COURT:  What is [the] underlying dispute?  You said there's a hard core underlying dispute that sounds like it goes back generations; what's the dispute?
>
> MR. JAMES:  Your Honor, I will try to summarize this as briefly as possible.  My client's great grandfather is Sir Robert Hotung.  Who was basically a founding member of Hong Kong.  Very highly regarded, and his estate left a substantial amount of wealth to several beneficiaries, including his son who unfortunately passed away after his father, that was there in turn left to my client's father.
>
> My client's father has approximately ten children. And in 1979 and 1980 he used his inheritance to create essentially two trusts for the protection of six of his children.  These trusts were kept secret until some of the children uncovered some documents in about 2000, 1999.
>
> The relationship between Mr. Hotung and my client, and the remainder of the siblings can be described as anything less than amicable. There have been several estrangements over the years.  Very bitter entanglements, fights and court battles, which brings us to the current dispute.
>
> After discovering what my client and his brother felt were suspicious transactions concerning the assets of  these trusts, potentially giving rise to criminal liability, they began to investigate and they commenced a lawsuit to produce the documents when the trustees would not produce them for them.  And this is a bit of -- I use this term liberally,

10

and I mean no pun by it, but an incestuous kind of relationship between this entire group.  The father, two trusts have two assets, which are the claimants.

My client's father is primary the managing director of those two assets, of those two companies, the claimants. The trustee of the trust that oversaw the boys' estate, the boys' money is the cousin of the father.  Also the mother of two of his father's children.  So there has been a lot of family in-fighting in that regard alone.

Basically when my client and his brother were successful in compelling production of the majority of these documents, the father commenced a lawsuit to block this by trying to revoke the trusts.  That resulted in three years worth of litigation in Hong Kong.  Ultimately, the father did not succeed.  It was held that the trusts would stand.  He did not have the power to revoke.  My client and his brother at that point were prevented further from commencing with their suit to compel the production of documents due to tangential matters related to that judgment that the father wanted clarified, which brought us to December 2005.

At that point, your Honor, my client is here today  and he's willing to testify and you could hear from him directly.  Despite this torrid family history, which I described to you, it's still a family.  And it's still a family name that's very well known in Hong Kong and this litigation was very public.  And in December my client no longer wanted to see the family name being put in the public eye.  Rather than joining his brother in a continuation of the suit to now produce any additional documents since 2001, he approached his father as a board of directors of one of the companies to voluntarily make amends.

Certain agreements were reached.  It was difficult, but still Sean is the son of his father, and with anybody's parents you want that relationship.  And they tried to make those amends.  Some agreements were reached, some were honored, some were not.

One of the agreements that was reached, my client will testify, was to production of these documents at the suggestion of his father as a board of director of one of the claimants.  The reason for that, my client will testify, was to prevent his brother, Anthony, from obtaining possession of them if he prevailed in his lawsuit, which he ultimately did in April of 2005.  So there is written correspondence between my client and the board of directors, i.e., his father, agreeing to this transaction.

My client will also testify, that at that point in  making amends he began to takeover many of the responsibilities of the claimants.  And he can elaborate more fully to the extent the Court would like to hear that.

Essentially the orders were that he was to arrange through HEL,

Hotung Enterprise Limited, one of the claimants, through the secretary to make the arrangements to ship the documents to the United States. Specifically ship them by water.  And Mr. Hotung will testify that was a specific concern of the father knowing it would take longer to get here and make it more inaccessible to the brother.

At that point, the transaction was entered into.

(Transcript of Order to Show Cause Hearing at 8:3-11:11 (July 31, 2006).)

In his testimony, plaintiff told the Court that his father, Eric Hotung, set up two trusts, naming plaintiff and his siblings as beneficiaries.  Intervenors HEL and HICL are companies within those trusts and plaintiff's father is on the board of those companies.  Plaintiff claims that he has a 50% interest in the trusts.  He stated that he and his siblings hired attorneys in Hong Kong to investigate "some very highly irregular financial activities" involving the trusts. (Transcript of Order to Show Cause Hearing at 28:2-7 (July 31, 2006).)

In 2001, the High Court of Hong Kong issued a ruling ordering the trustee to turn over to plaintiff and his brother certain financial documents of HEL and HICL.   Plaintiff testified that he and his brother "sent friendly letters trying to get the information," but the documents were never turned over to him.  (Id. at 37:17-18.)  In February of this year, after trying to get the documents since 2001, plaintiff met with his father to discuss the turnover of the documents.  Plaintiff testified that the father was reluctant to turn over the documents because he feared that the documents were going to fall into the hands of the plaintiff's brother in Hong Kong.  Plaintiff, as a consequence, "came up with the idea of shipping" the documents to himself, here in the United States, via ocean freight, choosing this form of transport to keep the documents "out of everyone's reach the longest."  (Id. at 38:7-38:5.)

12

In plaintiff's initial application for emergency relief, he submitted a number of letters, ostensibly between himself and HEL, in which he requested shipment of the documents.  Any fair reading of the documents establishes that HEL agreed to ship the documents to him.  But in the course of the hearing, plaintiff testified that in addition to composing the letters requesting the documents,  he also composed the letters from HEL agreeing to ship the documents.  He then dictated the letters to Esther Sze, a secretary at HEL,  who printed the letters on HEL letterhead and sent them to plaintiff.  This, then, is how the shipment of the cargo at issue (comprised solely of the HEL and HICL business documents that were the subject of the High Court of Hong Kong order) was arranged.  Plaintiff claimed that he wrote the HEL letters "[s]ubject to Eric Hotung's [the father's] approval."  (Id. 45:25.)

Ms. Sze arranged the shipment of the cargo with Santa Fe on behalf of HEL, as evidenced by the Acceptance Form from Santa Fe (Exhibit C to Declaration of Sze Yuen Yue) as well as an e-mail from Ms. Sze to plaintiff in which she stated that "the shipper is HEL and the Receiver is you" (Exhibit 6 to Amended Verified Complaint).  In that e-mail, Ms. Sze informed plaintiff that she would list him as both consignor and consignee on the Santa Fe waybill, because "Santa Fe said consignor & consignee should be personal to pesonal [sic] or company to company."  (Id.) Plaintiff, having now been listed as "shipper" on the Santa Fe waybill, represented to this Court that he *was* the shipper, and therefore to be viewed as a party to the contract with Santa Fe. Based on this, his original papers assert that Eric Hotung (the father and member of the boards of HEL and HICL) acted without authority when he directed Santa Fe to return the cargo to Hong Kong rather than deliver the cargo to the plaintiff.

Based on plaintiff's testimony, and given the context of the undisputed family conflict

raging in Hong Kong that spawned the convoluted plan plaintiff described, the Court is
constrained to find that plaintiff does not enjoy the status of shipper whose rights have been
improperly intruded upon, warranting relief from the federal courts.  Instead, the record at the
hearing  reveals that although the Santa Fe waybill lists plaintiff as shipper, HEL and not plaintiff
was the shipper of the cargo.  From the transcript of the hearing:

> THE COURT:  Now, Mr. James said initially that there was some kind of
> a detente reached between you and your father that led to the shipment
> being undertaken by you without protest by the companies, correct?
>
> THE WITNESS: That's correct.
>
> THE COURT:  Tell us about that in your own words.
>
> THE WITNESS: Okay.  In December, actually on January 17, I
> reached out to my father, tried to put this behind us because this in my
> mind was disgraceful.  It was getting in the press and we were looking
> pretty bad, I thought.  So I tried to put it behind us.  It was a difficult
> beginning, but finally started.
>
> We got to meet in February.  And his concern was that these
> documents were to fall in the hands of my brother, Anthony, because-- and
> Anthony was not going to let up. This was a very personal.  Bad things
> were done on both sides.  So it was very emotional.
>
> So he was now concerned Anthony was going to get the order from
> the court for all the documents.  In my opinion it was a no brainer because
> we already had the first order and we will prevail on every order, basically
> it's trust law.  We have right to have access to these documents. So he was
> extremely concerned about this.  And he was also concerned about
> liabilities that the trust companies are going to have.
>
> So he asked me if I would like to be the director of the trust
> companies and he would resign; and I said no, I don't want to do that
> because there's been liabilities here, I would have someone coming after
> me then.  So then he said, well, you know, how am I going to get basically
> out of this if we've got to turn the documents over?  And I said to him,  I
> am the 50 percent beneficiary, so you can't turn it over to me without
> breaching your fiduciary duties, so ship them over.  I came up with the
> idea of shipping.
>
> The reason behind it, it would be on the ocean longest and thus out
> of everyone's reach the longest.  His objective was to keep it out of Tony's
> hands, my brother, but I did make it clear to him if Tony asked for it and

14

he's getting it, and that's how we got into the fray.

       THE COURT:  Now, the consignor and the consignee was the same person, yourself, how did that happen?

       THE WITNESS:  That's right.  First of all, there was no problem sending it to me.  They wanted to send it to me so they could point the finger at me when my brother came around and said where's the documents.  Oh, it's in the U.S. they wanted that.

       As to the person sending it, we went to the 50 percent right, I am the 50 percent owner, thus they are, right, it is my property.  So that would work that way.  But there was also a problem.

       The United States government demanded a federal ID from the company shipping it.  And Esther and the Hotung companies did not have a federal ID.  So it had -- they said it's got to be company-to-company or person-to-person, so the person-to-person bill worked perfectly.

(Transcript of Order to Show Cause Hearing at 37:20-39:24 (July 31, 2006).)

       Plaintiff describes an arrangement whereby his father undertook to secrete the documents on the high seas, as it were, by prearrangement with plaintiff, with the goal of keeping them out of plaintiff's brother's hands.  Were it not for the lack of a federal ID, plaintiff's testimony indicates that the shipper would have been HEL, not plaintiff.  Moreover, the plan concocted by plaintiff and his father is established through documents created solely by plaintiff.  However one attempts to construe plaintiff's testimony, given its context of bitter disputes and a love/hate relationship between and among the participants in the bitter battle, the conclusion is that the ownership and executive control of the documents remained in HEL's and HICL's hands, as most clearly demonstrated by Eric Hotung's vigorous and aggressive efforts to get them back before they reached plaintiff.

       This finding has immediate consequences.  To begin with, plaintiff cannot assert a viable claim for breach of contract if he was not a party to either the Santa Fe bill of lading nor the

Profit Cheer bill of lading.  Therefore, although the Court will deny the intervenors' motion to dismiss on the grounds raised, dismissal is appropriate on the breach of contract count because the facts at the hearing establish that plaintiff was not a party to either contract, a prerequisite for relief for breach of contract. "[O]ne who is not a party to a contract cannot maintain a suit for breach of duty arising out of the contract."  In re National Molding Co., 230 F.2d 69, 72 (3d Cir. 1956).  Therefore,  the plaintiff's third count for breach of a maritime contract is dismissed.

In addition, plaintiff cannot assert a viable claim for conversion, because he didn't have a legally cognizable right to the cargo.  "Conversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property."  McAdam v. Dean Witter Reynolds, Inc.,  896 F.2d 750, 771 (3d Cir. 1990).  HEL and HICL were the owners of the cargo when shipment was made.  The Santa Fe waybill, a non-negotiable document, did not vest title in the consignee.  "Like bills of lading, waybills are contracts for the carriage of goods. But in contrast to bills of lading, waybills are nonnegotiable."  Sompo Japan Ins. Co. of America v. Union Pacific R. Co.,  2006 WL 1900996, 18 n.4 (2d Cir. 2006) (citations omitted).  "The negotiability feature of [a] bill of lading means that it functions as a *document of title*."   T. Schoenbaum, 2 Admiralty and Maritime Law §§ 10-11 at 48-49 (2d ed.1994) (emphasis in original).  By bringing his claim under Rule D, plaintiff has asserted a legal claim to possession of the cargo.  Stathos v. The Maro, 134 F.Supp. 330, 332 (E.D.Va.1955). The Court finds that the plaintiff did not show that he has a legal claim to possession of the cargo merely by being a named consignee under a non-negotiable bill of lading.

This Court is not prepared to declare, by judicial fiat,  that plaintiff has a legal claim to the possession of the cargo based upon the court order by the High Court of Hong Kong.  Eric

Hotung (the father), as a representative of both HEL and HICL,  the true owners of the cargo, requested that the carrier return the goods to Hong Kong rather than deliver the goods to the consignee. The owner of cargo under a non-negotiable bill of lading is legally entitled to direct the carrier not to make delivery to the consignee listed on that non-negotiable bill of lading.  49 U.S.C. § 80111.  Because plaintiff had no legal claim to the possession of the cargo at issue, the Court grants the intervenors' motion to dismiss the first count for immediate possession of the cargo and the fourth count for conversion of the cargo.  Therefore,  the Court will also vacate the order for issuance of summons and warrant of arrest of the cargo and will order that the substitute custodian, Commercial Services Corporation, immediately surrender possession of the defendant cargo to the intervenors.

## IV.    COSTS

Intervenors have asked the Court for costs for wrongful arrest "in an amount to be determined by the Court."  (Moving Brief at 18.)   However, the intervenors have not supplied the Court with any case law or statutes to show that they are entitled to costs, nor have they made a counter-claim for wrongful arrest to which those costs might attach.

For his part, plaintiff has requested that the Court order intervenors to pay one-half of the costs of the third-party custodian during the weeks of this litigation.

Both requests are denied because neither side has made a compelling case for these extra forms of relief.

## V.    CONCLUSION

For the reasons stated above, the intervenors' motion to dismiss is granted as to counts I,

17

III, and IV, and inasmuch as plaintiff has voluntarily withdrawn the replevin count, Count II is

dismissed.  An appropriate order will be entered.


Dated: September 7, 2006


                                                    /s/   Katharine S. Hayden
                                                    KATHARINE S. HAYDEN
                                                    UNITED STATES DISTRICT JUDGE

18